# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 10, 2002

## STATE OF TENNESSEE v. EDWARD L. WILLIAMS

### Direct Appeal from the Criminal Court for Knox County
### No. 67839    Richard R. Baumgartner, Judge

### No. E2002-00325-CCA-R3-CD
### October 31, 2003

A Knox County jury convicted the juvenile defendant, Edward L. Williams, of premeditated first degree murder and especially aggravated robbery. The trial court imposed consecutive sentences of life for the premeditated murder conviction and twenty-two years for the especially aggravated robbery conviction. On appeal, the defendant contends: (1) the evidence is insufficient to support the conviction for premeditated murder; and (2) the trial court erred in imposing consecutive sentences. We remand for entry of an amended judgment reflecting a sentence of life with the possibility of parole and deleting any reference to a merger of the premeditated murder count and the felony murder count. We further order that the sentences run concurrently rather than consecutively. We otherwise affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of Conviction of the Criminal Court Affirmed as Modified; Sentence Modified; Remanded

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

D'Artagnan H. Perry, Knoxville, Tennessee, for the appellant, Edward L. Williams.

Paul G. Summers, Assistant Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; Randall E. Nichols, District Attorney General; and G. Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the robbery and murder of twenty-two-year-old Theonda Williams on February 16, 1999. The defendant was fourteen years old at the time. Although the defendant and the victim have the same last name, they were not related.

Frank Williams, the brother of the victim, testified that on the evening of February 16, 1999, he was at the victim's residence with the victim, the victim's girlfriend, Tamisha Shervington, the defendant, the defendant's brother, and Ms. Shervington's mother. He stated the victim and the defendant were drinking alcohol and smoking marijuana. Mr. Williams testified that at

approximately 11:05 p.m., he asked the victim to drive him to his residence, while the defendant also asked the victim to drive him to another destination. He stated that prior to entering the vehicle, several men drove up to the residence; the defendant retrieved a revolver from his pocket; and the men drove away.

Mr. Williams testified the victim drove a white Oldsmobile with a "nice" stereo. The victim and the defendant argued regarding the type of music to play, but neither made any threats during this time. He testified the victim did not possess a firearm that evening. He further testified that upon arriving at his residence, the victim then left with the defendant.

Tamisha Shervington testified the defendant was a neighbor, and that the victim became friends with the defendant. She testified that on February 16, 1999, between midnight and 1:00 a.m., the victim, Frank Williams, and the defendant left her residence in the victim's white Oldsmobile. She stated the vehicle contained a compact disc player with speakers in the trunk. She further stated that when she last saw the vehicle, it was not damaged, and the stereo was intact and operational.

Marcus Thomas testified that on February 17, 1999, after speaking to the defendant's sister, Tiffany Jones, he drove her around the Mechanicsville area of Knoxville, in his blue Honda Accord searching for the defendant. He stated they observed the victim's car with a flat tire and bullet hole in the driver's side window parked in front of a house. He parked his vehicle behind the car, and the defendant exited the house minutes later.

Mr. Thomas testified Tiffany Jones informed the defendant that a news program had reported that the victim was dead. The defendant then explained he had been searching for the victim earlier that day and observed the victim's vehicle parked on Boyd's Bridge Pike. The defendant stated that when he saw no one inside the vehicle, he drove the vehicle around the area searching for the victim.

Mr. Thomas stated the defendant retrieved articles of clothing from underneath the seats of the vehicle. The defendant then attempted to open the trunk of the vehicle with a key. However, the defendant explained the lock was broken, and the trunk would not open. Mr. Thomas testified the defendant then moved the vehicle to another location and removed clothing and compact discs from the vehicle.

Mr. Thomas testified he drove the defendant and his sister to the defendant's residence where they were stopped by several police officers. He stated that when the officers activated their blue lights, the defendant instructed him not to stop because he was "on the run." The defendant also instructed his sister to hold a box of bullets. Mr. Thomas testified that upon consenting to a search of his vehicle, the officers retrieved a firearm, a box of bullets, and a set of keys which did not belong to him.

Officer Felix Voss of the Knoxville Police Department testified that upon retrieving the white Oldsmobile, he observed that the radio was missing, the driver's side window was damaged, and the trunk appeared to have been "pried open." Officer Daniel Crenshaw testified that fingerprints lifted from the passenger side interior window of the vehicle matched the defendant's fingerprints. Blood was discovered on the interior driver's side door within a foot of a bullet hole.

Officer Tony Willis testified he was dispatched to Robert Huff Road where he observed the victim's body lying face down in a ditch on the side of the road. Officer Willis testified he and Detective Bennie French went to the defendant's residence and observed the defendant sitting in the back seat of the blue Honda Accord. Upon taking the defendant into custody and obtaining consent to search the vehicle, the officer found a .38 caliber pistol with five rounds in the area where the defendant had been sitting, a box of .38 ammunition in the floorboard, and a set of keys. Officer Thomas Evans testified the firearm discovered in the blue Honda was a .38 caliber revolver which contained five shells.

Detective Bennie French testified that upon taking the defendant into custody, the defendant waived his *Miranda* rights and made a statement. The defendant admitted he shot the victim while on Boyd's Bridge Pike. He stated he believed the victim intended to harm him because he "could see it in his eyes" and the victim "came up on [him]." He indicated he did not see the victim with a firearm and never informed the officers that the victim attacked him with a speaker.

Detective French testified he interviewed Tiffany Jones, who stated that the defendant and the victim had argued and were "talking about violence to each other." She informed the detective that when the officers approached the blue Honda, the defendant attempted to give her a box of ammunition, but she laid them on the floor on the front passenger's side. She stated the defendant also attempted to give her a set of keys, but she placed them in between the seats of the vehicle.

TBI Agent Don Carman, an expert in firearms identification, testified the firearm found by the officers was a double-action .38 caliber revolver. He explained an individual could fire the revolver in single-action mode, but he or she must first cock the hammer before pulling the trigger. He stated approximately three and one-half pounds of pressure was required to pull the trigger in single-action mode, while approximately twelve pounds of pressure was required to pull the trigger in double-action mode. Agent Carman opined that once the gun was fired, a second shot could not be accidental. He stated he also tested a .38 caliber Winchester bullet taken from the victim's body and concluded the bullet was fired from the revolver discovered in the Honda.

Dr. Sandra Elkins, the medical examiner, testified that on February 17, 1999, she reported to a crime scene on Robert Huff Road where she observed the victim's body lying face down with his arms outstretched over his head and his pants pulled below his knees. Dr. Elkins stated the victim was five feet, eight inches tall and weighed 140 pounds. She further stated the victim had a blood-alcohol level of .13, and there were no drugs found in his system.

Dr. Elkins conducted an autopsy of the victim's body and discovered two gunshot wounds. She stated one of the bullets entered the right side of the victim's head and exited through the other side. Based upon the gunshot residue found embedded in the skin around the entrance wound, Dr. Elkins estimated the gun was fired from a distance of twelve to twenty-four inches from the victim's head. Based upon the gunshot residue found on the victim's shirt around the chest wound, Dr. Elkins estimated the gun was fired from a distance of twelve inches or less from the body. Dr. Elkins further opined either of the wounds would have been fatal.

Tiffany Jones, the defendant's sister, testified that approximately one and one-half weeks prior to the victim's death, the victim threatened her and the defendant with a firearm. She stated the victim was intoxicated at the time, and when the victim was intoxicated, he suffered from "mood swings." She further stated the victim believed the defendant and the victim's girlfriend were involved in a relationship, and he threatened to kill the defendant on other occasions. She denied the defendant ever threatened the victim. She stated that on the night of February 16, 1999, she was at the victim's residence and observed that he was intoxicated. She further stated she did not see the defendant with a gun that night and that the defendant was afraid of the victim.

Garrett Jones, the defendant's brother, testified that on a prior occasion, the victim threatened the defendant with an automatic weapon while at the victim's residence. He stated the victim had been intoxicated and was "mean" when he drank alcohol.

The defendant testified the victim was a neighbor, whom he occasionally visited. He stated that on one occasion, the victim, who was intoxicated, threatened him with a gun.

The defendant testified that on February 16, 1999, between 11:00 p.m. and midnight, he went to the victim's residence and asked the victim to drive him to a friend's house. He stated the victim was intoxicated and continued to drink alcohol while driving. The defendant testified that after dropping Frank Williams off at his residence, they drove down Boyd's Bridge Pike where the victim accused him of having a relationship with his girlfriend. The victim became upset and came at the defendant with a speaker. The defendant stated he was afraid and produced a gun from his pocket. The defendant testified he then fired two consecutive shots, the first of which hit the victim's chest. He maintained he "didn't mean to shoot" but was afraid for his life.

The defendant testified that after he shot the victim, he placed the victim's body on the side of the road and drove the vehicle to Mechanicsville in order to "get away from the scene." He stated another man later took the stereo from the vehicle. He further stated Mr. Thomas attempted to open the trunk of the victim's vehicle with a crowbar and then took the keys.

The jury convicted the defendant of premeditated first degree murder and especially aggravated robbery. The trial court imposed consecutive sentences of life for the murder conviction and twenty-two years for the especially aggravated robbery conviction.


## I. SUFFICIENCY

The defendant contends the evidence is insufficient to support a conviction for premeditated first degree murder. Specifically, he maintains the proof presented at trial failed to establish premeditation. We disagree.

### A. Standard of Review

Regarding our review of the sufficiency of the evidence, the relevant question is whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of every

element of the offense. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). In determining the sufficiency of the evidence, we do not reweigh or reevaluate the evidence or substitute our inferences for those drawn by the trier of fact from circumstantial evidence. State v. Butler, 108 S.W.3d 845, 848 (Tenn. 2003). To the contrary, we are required to afford the state the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn from it. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). The defendant has the burden of proof on the sufficiency of the evidence at the appellate level since a verdict of guilt removes the presumption of a defendant's innocence. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## B. Premeditated First Degree Murder

The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." Id.

Premeditation is a question of fact to be determined by the jury, State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000), who may infer premeditation from the manner and circumstances of the killing. State v. Jerry Ray Davidson, No. M1998-00105-SC-DDT-DD, 2003 WL 22398392, at *12 (Tenn. Oct. 20, 2003); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Several circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. Davidson, 2003 WL 22398392 at *12; State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

The proof presented at trial established the defendant shot the unarmed victim twice at close range and dumped his body on the side of the road. Detective French testified the defendant's sister informed him that the victim and the defendant had previously argued and had spoken about "violence to each other." Frank Williams stated he observed the defendant in possession of a revolver prior to entering the victim's vehicle. Furthermore, the defendant admitted to Detective French that the victim did not threaten him with a gun prior to the shooting. Agent Carman testified a second shot with the revolver could not have been accidental. Dr. Elkins testified both gunshots were fired from a distance very close to the victim.

The evidence further established the defendant acted in a calm manner immediately after the killing. He dumped the victim's body on the side of the road and fled in the victim's vehicle. The defendant parked the vehicle at another location and retrieved various articles of clothing and compact discs from inside the vehicle. When police officers began to approach Mr. Thomas' vehicle, the defendant instructed Mr. Thomas not to stop because he was "on the run." He then asked his sister to conceal a box of ammunition and a set of keys for him.

We conclude a rational jury could find the defendant formed a design or intent to kill and did so upon exercising reflection and judgment. It was within the jury's purview to reject the self-defense theory. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Therefore, the evidence is sufficient to support the conviction for premeditated first degree murder.

## C. Felony Murder Count

We note that the defendant was charged in Count 1 of the indictment with premeditated first degree murder and in Court 2 with first degree murder in perpetration of robbery (felony murder). The trial court charged the jury as to premeditated first degree murder immediately followed by its lesser-included offenses. Thereafter, the court charged felony murder without specifically listing any lesser-included offenses. The instructions did not contain any directive as to whether the jury should or should not proceed to the felony murder count if it found the defendant guilty of premeditated first degree murder or any of its lesser-included offenses. At the conclusion of the charge, the prosecutor objected at a bench conference, arguing the jury should consider felony murder before considering the lesser offenses if the jury acquitted of premeditated first degree murder. The trial court informed counsel the jury would only consider felony murder if it found the defendant not guilty of premeditated first degree murder and all of its lesser-included offenses. Again, we note the actual jury instructions were silent on this point.

The jury charge does not indicate that a verdict form was provided to the jury, and there is no verdict form in the record.[1] The jury reported its verdict by responding to the trial court's inquiries. As to premeditated first degree murder, the foreperson announced the jury found the defendant guilty. The trial court then asked for the verdict as to especially aggravated robbery, thus skipping the felony murder count. The foreperson asked the trial court about the "felony murder," but the trial court again asked for a verdict as to especially aggravated robbery. Upon the foreperson indicating a guilty finding on especially aggravated robbery, the jury was polled and released by the trial court. The jury was never given an opportunity to advise the trial court as to whether it had, in fact, reached a verdict on felony murder. Based upon the jury's question about felony murder and the lack of any instructions about consideration of the felony murder count, it would appear very likely the jury had indeed reached a verdict as to felony murder.

When an indictment charges both premeditated first degree murder and felony murder, the trial court should instruct the jury to return a verdict on both counts. State v. Cribbs, 967 S.W.2d 773, 788 (Tenn. 1998). If convictions are returned on both counts, the convictions are to be merged by the trial court into a single conviction of first degree murder. State v. Price, 46 S.W.3d 785, 824-25 (Tenn. Crim. App. 2000). Thus, the trial court should have instructed the jury to return a verdict as to both premeditated first degree murder and felony murder. In our view, the practice of not receiving a verdict as to both premeditated first degree murder and felony murder is fraught with

---

[1]This is another case in which the use of a jury verdict form, as is customarily used, would have been beneficial. *See* State v. Donald Lee Reid, No. M2000-02026-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 699, at *16 (Tenn. Crim. App. Sept. 7, 2001, at Nashville).

peril. One such peril is the possible double jeopardy implication should the evidence not be sufficient to support the particular count upon which the jury did return a verdict.

Because the jury was never asked about and did not return a verdict on felony murder, we are not at liberty to examine whether the evidence is sufficient to sustain a felony murder conviction. Our examination relating to sufficiency of the evidence is limited to premeditated first degree murder because of the procedure utilized in securing the jury verdict. Further, we note the judgment of conviction states that the felony murder conviction was merged with the premeditated first degree murder conviction. Because the jury did not return a verdict on felony murder, we remand for entry of an amended judgment deleting this language.

## II. SENTENCING

The defendant contends the trial court erred in ordering his sentences to be served consecutively. We agree.

### A. Sentencing Hearing

During the defendant's sentencing hearing, the transcript of his bond revocation hearing was admitted into evidence. During the bond revocation hearing, Officer Harry McGuffey testified that on November 30, 2000, while the defendant was on bond for the instant offense, officers stopped a green Plymouth Neon. Officer McGuffey went to the scene, having received a report that two or three individuals in a Plymouth Neon were shooting at a house.

Officer McGuffey testified the other officers had their weapons drawn on the driver, who was standing outside of the vehicle. The officer stated that while the officers were securing the driver, the defendant, who was sitting on the passenger's side, fled in the vehicle. Officer McGuffey gave chase and eventually stopped the defendant. The defendant pointed a gun at the officer, and the officer then shot the defendant in his left arm. Antonio Moore testified that on that evening, prior to the stop, the defendant and his cousin fired approximately twenty gunshots into Broderick Hayes' residence, which was also a day care center.

During the sentencing hearing, Detective Larry Vineyard testified that on June 26, 1998, he interviewed the defendant regarding the shooting of Desmond White. The defendant informed the detective that he and his brother were involved in a confrontation with White outside of their residence. The defendant stated White fired two gunshots toward him, and in response, he fired three rounds hitting White in his chest and right leg. Detective Vineyard stated the defendant was charged in juvenile court with attempted murder, but the charge was dismissed when the defendant was subsequently charged in regard to the present convictions.

### B. Trial Court's Findings

The trial court sentenced the defendant to twenty-two years for the especially aggravated robbery conviction and ran the sentence consecutively to the life sentence for first degree murder.

In imposing consecutive sentencing, the trial court described the defendant as a "truly dangerous" individual who "should not be on the street with other members of society." The trial court further noted, "I think you have no regard for other human life, . . . and I don't believe that there is any consequence that this Court can impose . . . on you that is going to change that conduct." However, the trial court further found the defendant did not commit the murder "for the purpose of taking his car," but rather the theft of the car was "a necessary result of the conduct itself." The trial court then stated it would not run the sentence consecutively "[i]f that was the only factor that I was considering here."

The trial court found the defendant to be a "dangerous offender, whose behavior indicates little or no regard for human life and no hesitation . . . about committing a crime in which the risk to human life is high." See Tenn. Code Ann. § 40-35-115(b)(4) (1997). The trial court further found the defendant to be a danger to society. The court noted the violent incidents unrelated to the present charges and concluded the defendant had repeatedly demonstrated the danger he posed to society and his disregard for human life. The court then ordered the defendant's sentences for premeditated murder and especially aggravated robbery to be served consecutively.

## C. Analysis

A court may order sentences to run consecutively if the court finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (1997). Furthermore, in the event the trial court finds defendant is a "dangerous offender," it must also determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; and (2) serve to protect the public from further criminal conduct by the offender. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

In imposing consecutive sentences, the trial court found the defendant to be "a dangerous offender whose behavior indicate[d] little or no regard for human life, and no hesitation about committing a crime in which the risk to human life was high." See Tenn. Code Ann. § 40-35-115(b)(4) (1997). The trial court did not expressly address the two Wilkerson factors. See Wilkerson, 905 S.W.2d at 939. Nevertheless, it is apparent from the trial court's findings that it felt consecutive sentencing was necessary to protect the public from further criminal conduct by the defendant, the second Wilkerson factor. Id. However, the trial court did not find or state that the effective sentence of life plus twenty-two years reasonably related to the severity of these two offenses, the first Wilkerson factor. Id. In fact, the trial court's remarks that the theft was simply a "necessary result" of the homicide seem to indicate the contrary. Further the trial court stated it would not order consecutive sentences based on that factor alone. Because the effective sentence of life plus twenty-two years must reasonably relate to the severity of these two convictions, we conclude, based upon the trial court's comments, the sentences must run concurrently.

### III.  CLERICAL ERROR

The trial transcript reflects that upon return of the jury's verdict convicting the defendant of premeditated first degree murder, the trial court imposed a standard life sentence.  However, in the judgment, the box between "Life" and "Life without Parole" is marked; as a result, the judgment technically appears to reflect a sentence of life without parole.  Therefore, we remand for entry of an amended judgment accurately reflecting a life sentence with the possibility of parole.

### IV.  CONCLUSION

In summary, we conclude the evidence is sufficient to support the defendant's conviction for premeditated first degree murder, but the trial court erred in imposing consecutive sentences.  Because the jury did not return a verdict on the felony murder count, we also remand for entry of an amended judgment deleting any reference to the merger of the felony murder count and the premeditated murder count.  Further, the amended judgment will reflect a sentence of life with the possibility of parole for first degree murder.  We otherwise affirm the judgments of the trial court.

_____
JERRY L. SMITH, JUDGE